## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **KIMBERLY DENISE HILLIARD,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:15cv00018 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

### I.  Background and Standard of Review

Plaintiff, Kimberly Denise Hilliard, ("Hilliard"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hilliard protectively filed an application for DIB on January 18, 2012, alleging disability as of November 7, 2011, due to chronic obstructive pulmonary disease, ("COPD"); heart problems; diabetes; depression; anxiety; tachycardia; neuropathy in the feet and legs; uncontrolled pain in the lower extremities; memory difficulties; and inability to be in crowds. (Record, ("R."), at 20, 176, 195-201, 237, 269, 278.) The claim was denied initially and on reconsideration. (R. at 100-02, 105-08.) Hilliard then requested a hearing before an administrative law judge, ("ALJ"). (R. at 111-12.) A hearing was held by video conferencing on November 6, 2013, at which Hilliard was represented by counsel. (R. at 33-59.)

By decision dated January 29, 2014, the ALJ denied Hilliard's claim. (R. at 20-28.) The ALJ found that Hilliard met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2015.[1] (R. at 22.) The ALJ also found that Hilliard had not engaged in substantial gainful activity

---

[1] Therefore, Hilliard must show that she became disabled between November 7, 2011, the alleged onset date, and January 29, 2014, the date of the ALJ's decision, in order to be entitled to DIB benefits.

-2-

since November 7, 2011, her alleged onset date. (R. at 22.) The ALJ found that the medical evidence established that Hilliard suffered from severe impairments, namely asthma; COPD; history of arrhythmia ablation times three in 2007 with no recurrent problems; diabetes; obesity; depression; and anxiety, but she found that Hilliard did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22-23.) The ALJ found that Hilliard had the residual functional capacity to perform simple, routine, repetitive light work[2] that did not require more than occasional climbing of ramps and stairs, bending, stooping, kneeling, crouching and crawling, that required no climbing of ladders, scaffolds or ropes, that did not require concentrated exposure to temperature extremes and that required no more than occasional exposure to dust, chemicals and fumes, and that required no public interactions and no more than occasional interaction with co-workers and supervisors. (R. at 24.) The ALJ found that Hilliard was unable to perform her past relevant work as a licensed practical nurse, ("LPN"), or a certified nursing assistant, ("CNA"). (R. at 27.) Based on Hilliard's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Hilliard could perform, including jobs as an inventory clerk, a food prep worker and an office helper. (R. at 28.) Thus, the ALJ found that Hilliard was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 28.) *See* 20 C.F.R. § 404.1520(g) (2015).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time and frequent lifting or carrying items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

After the ALJ issued her decision, Hilliard pursued her administrative appeals, (R. at 15-16), but the Appeals Council denied her request for review. (R. at 1-6.) Hilliard then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Hilliard's motion for summary judgment filed September 26, 2015, and the Commissioner's motion for summary judgment filed October 29, 2015.

## II. Facts

Hilliard was born in 1963, (R. at 195), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Hilliard has a high school education and a nursing degree. (R. at 182, 238.) She has past work experience as an LPN and a CNA. (R. at 179, 238, 246.) Hilliard stated that in February 2009, she was hospitalized with acute respiratory failure secondary to asthma. (R. at 39.) Hilliard stated that Dr. Arnold, her primary care physician, was treating her respiratory ailments. (R. at 38.) She stated that she could not work due to shortness of breath, neuropathic pain in the lower extremities, memory loss, confusion and panic attacks. (R. at 40.) She stated that she was prescribed oxygen after her 2009 hospitalization, which she wore nightly and, sometimes, during the day, and that she took breathing treatments at least once daily and carried a rescue inhaler. (R. at 41-42, 46.) Hilliard testified that the steroids in the breathing treatments made her more nervous and "jittery-like." (R. at 47.) Hilliard testified that she experienced shortness of breath when showering, bathing, dressing, at times, and walking up inclines and that weather changes and certain smells caused wheezing. (R. at 42-

-4-

43, 46.) Hilliard also stated that she had pain from the hips and lower back all the way down to her feet. (R. at 43.) She stated that she also had pain in her wrists and that, at times, her feet, toes and fingers would go numb, which she attributed to her diabetes. (R. at 43.) Hilliard estimated that she could walk for three to five minutes before experiencing pain and having to stop to catch her breath, that she could lift items weighing less than 10 pounds, and she stated that she had to rest three to four hours during the day due to body fatigue and pain. (R. at 44-45.)

Hilliard testified that she lived in a house with her disabled husband, and they could prepare simple meals and grocery shop. (R. at 47-48.) She testified that she read, watched television and attended church services when able. (R. at 48.) She stated that she did not drive due to the numbness and pain in her feet and legs. (R. at 49.) Hilliard testified that she smoked previously, but had quit. (R. at 49-50.) She stated that she was not seeing a counselor for her depression because she did not like to "rehash" everything each time she got a new counselor. (R. at 50.)

Sanders,[3] a vocational expert, also was present and testified at Hilliard's hearing. (R. at 53-57.) She classified Hilliard's past work as both a CNA and an LPN as medium.[4] (R. at 53.) Sanders testified that a hypothetical individual who

---

[3] The first name of the vocational expert is contained neither in the transcript of the ALJ's hearing nor on her own resume. (R. at 33, 53, 165-67.) She is referred to only as "Ms. Sanders." (R. at 33, 53.)

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2015).

-5-

could perform light work that required no climbing of ladders, steps or ropes, only occasional climbing of stairs and ramps, balancing, stooping, kneeling and crouching, no crawling and that did not require concentrated exposure to extreme temperatures, humidity and wetness or more than occasional exposure to dust, chemicals and fumes and that required no more than simple, routine, repetitive job tasks with no public interaction and only occasional interaction with co-workers and supervisors could not perform Hilliard's past work, but could perform other jobs existing in significant numbers in the national economy, including those of an inventory checker, a food prep worker and an office helper. (R. at 54-56.) When asked to consider the same hypothetical individual, but who must rest two hours daily, Sanders testified that no work would be available if this resting occurred during the workday. (R. at 56-57.) Sanders testified that, if an individual must miss two days or more of work monthly, she could perform no jobs. (R. at 57.)

In rendering her decision, the ALJ reviewed medical records from Wellmont Bristol Regional Medical Center; Dr. Dave Arnold, M.D.; Cardiovascular Associates, PC; Sapling Grove Family Physicians; Healing Hands Health Center; Dr. Edwin Cruz, M.D.; Julie Jennings, Ph.D., a state agency psychologist; Dr. Michael Hartman, M.D., a state agency physician; Sandra Francis, Psy.D., a state agency psychologist; and Dr. Catherine Howard, M.D., a state agency physician. Hilliard's attorney also submitted medical records from Bristol Regional Medical Center and Healing Hands Health Center to the Appeals Council.[5]

---

[5] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

-6-

The medical evidence included in the record, but dated prior to Hilliard's alleged onset of disability, includes a hospitalization at Wellmont Bristol Regional Medical Center, ("Bristol Regional"), from February 9, through February 12, 2009, for treatment of community acquired pneumonia with acute respiratory failure. (R. at 434-67, 601-03.) Chest x-rays showed no acute cardiopulmonary disease, but a pulmonary function test showed severe obstructive defect. (R. at 455, 457, 460.) Hilliard was discharged in stable condition with diagnoses of acute respiratory failure, secondary to asthma exacerbation; asthma exacerbation; probable COPD; and community-acquired pneumonia. (R. at 435-36.) Dr. Brett Odum, M.D., prescribed Effexor, Xanax, trazodone, prednisone, Spiriva, Advair and Zithromax and strongly encouraged her to quit smoking. (R. at 435, 601.) Thereafter, she presented to the emergency department at Bristol Regional on August 9, 2009, with complaints of persistent chest pain radiating into the left shoulder. (R. at 402-16.) A chest x-ray was normal, and an ECG showed a predominantly normal sinus rhythm, and a Holter monitor study showed normal sinus rhythm, but frequent premature atrial contractions with one atrial couplet. (R. at 404, 413, 432-33.) Hilliard was diagnosed with atypical chest pain. (R. at 404.)

Hilliard saw Dr. Arun Rao, M.D., a cardiologist at Cardiovascular Associates, PC, for evaluation of arrhythmias and chest pain on August 13, 2009. (R. at 306-07.) Three prior ablations for sinus node modification were noted. (R. at 306.) Dr. Rao found the asymptomatic premature atrial contractions likely due to cold medicine usage. (R. at 306.) Pulmonary and cardiac examinations were normal, Hilliard was fully oriented, and Dr. Rao diagnosed hypertension; frequent,

-7-

but asymptomatic, premature atrial contractions; and atypical chest pain, probably musculoskeletal. (R. at 307.) Hilliard did not show for a nuclear stress test, and she failed to return for a follow-up appointment on October 15, 2009. (R. at 304-05.)

Hilliard returned to the emergency department at Bristol Regional on December 27, 2009, with complaints of low back pain and abdominal pain. (R. at 377-83.) She had tenderness to the left lower abdominal quadrant, but a back examination was normal. (R. at 379-80.) A CT scan of the abdomen and pelvis showed no acute process to explain Hilliard's symptoms, but a possible tiny ovarian cyst was noted. (R. at 387-89.)

Hilliard was seen at Holston Medical Group Urgent Care Clinic, ("Urgent Care"), on four occasions from January 17 through August 30, 2011. (R. at 519-21, 527-29, 532-35.) Over this time, she complained of left shoulder pain radiating down her arm, urinary tract infection symptoms and a possible diverticulitis flare up. (R. at 519-21, 527-29, 532-35.) An x-ray of the left shoulder showed minimal AC degenerative changes, for which Dr. Alfred Harkleroad, M.D., prescribed tramadol, cyclobenzaprine and full range of motion exercises. (R. at 535.) On February 4, 2011, Hilliard exhibited full flexion and extension of the elbow and full range of motion of the shoulder without pain. (R. at 533.) Dr. Harkleroad diagnosed epicondylitis and prescribed meloxicam. (R. at 533.) On July 5 and August 30, 2011, lung and cardiovascular examinations were normal. (R. at 520, 528.) On August 30, 2011, Hilliard was diagnosed with abdominal pain and diverticulitis of the colon. (R. at 520-21.)

-8-

Hilliard saw her primary care physician, Dr. Brett Odum, M.D., on two occasions from April 8 through October 10, 2011, for treatment of asthma, allergy symptoms and anxiety. (R. at 515-18, 530-31.) She had normal lung and cardiovascular examinations on both April 8, and October 10, 2011, and Dr. Odum diagnosed allergic rhinitis and asthma, for which he provided Singulair samples. (R. at 517, 531.) On October 10, 2011, Hilliard denied depression, wheezing, chest pain, shortness of breath and abdominal pain. (R. at 515.) Dr. Odum diagnosed allergic rhinitis and noted that her allergy symptoms were stable. (R. at 517-18.)

On July 10, 2011, Hilliard presented to the emergency department at Bristol Regional with complaints of low back pain and abdominal pain. (R. at 364-70.) Respiratory and cardiac examinations were normal, but costovertebral angle, ("CVA"), tenderness was noted. (R. at 366.) A CT scan of the abdomen and pelvis revealed no acute abnormalities, and she was diagnosed with acute abdominal pain and back pain. (R. at 366, 374-75.)

During the time period relevant to Hilliard's disability claim, she presented to the Urgent Care on one occasion, on November 9, 2011, with complaints of shortness of breath and body aches. (R. at 505-07.) Oxygen saturation level was 96 percent. (R. at 505.) Hilliard was in no acute distress with normal lung and cardiovascular examinations. (R. at 506.) An EKG yielded normal results, except

-9-

for a bigeminy rhythm,[6] and a chest x-ray revealed no evidence of acute cardiopulmonary disease. (R. at 506, 508-13.) Dr. Leighann Livingston, D.O., diagnosed chest pain. (R. at 507.)

Hilliard presented to the emergency department at Bristol Regional on five occasions between November 9, 2011, and August 21, 2013, with complaints of chest pain and shortness of breath and low back pain radiating into the right leg. (R. at 318-63, 660-84.) On November 9, 2011, respiratory examination was normal, but an irregular cardiac rhythm was noted. (R. at 350.) Hilliard was diagnosed with acute chest pain and cardiac arrhythmias. (R. at 350, 354.) On November 14, 2011, respiratory and cardiac examinations were normal, an EKG showed normal sinus rhythm, and chest x-rays and lab work were normal. (R. at 337, 345.) Hilliard's history of COPD, nightly oxygen usage and prior cardiac ablations were noted, and she was diagnosed with acute chest pain and exacerbated COPD. (R. at 337-38, 340.) On December 8, 2011, Hilliard was anxious and depressed and was in mild distress. (R. at 320.) She had normal respiratory and cardiovascular examinations, chest x-rays and lab work were normal, and an ECG showed a left atrial abnormality, but sinus rhythm. (R. at 300, 326-28, 330-31.) She was diagnosed with acute chest pain and general myalgias, prescribed Neurontin and discharged in improved condition. (R. at 320, 322, 325.)

On March 24, 2013, Hilliard complained of chest pain symptoms which were described as "pleuritic." (R. at 676.) She was alert, fully oriented and in no

---

[6] A bigemeny rhythm refers to the occurrence of two beats of the pulse in rapid succession. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 204 (27th ed. 1988).

acute distress with a normal mood and affect. (R. at 677.) Hilliard had a normal cardiovascular examination, peripheral pulses were strong and equal, cranial nerves were intact, there was no motor or sensory deficit, no extremity tenderness or edema or calf tenderness, and she had full range of motion in all extremities. (R. at 677.) She was diagnosed with pleuritic pain and central chest pain and discharged in stable condition. (R. at 677, 680.) Hilliard returned to the emergency department at Bristol Regional on August 21, 2013, with complaints of low back pain radiating into the right leg, worsened by movement. (R. at 660-64.) She had mild to moderate lumbosacral paravertebral spasm on the right side, but good range of motion with normal flexion, extension and rotation. (R. at 663.) There was no evidence of lower extremity weakness, no specific sensory findings, and straight leg raise testing was normal. (R. at 663.) X-rays of the lumbar spine showed some degenerative joint changes. (R. at 663.) Hilliard was diagnosed with backache and paravertebral muscle spasm and received Lortab and naproxen. (R. at 663-64.)

Hilliard continued to see Dr. Odum from November 14, 2011, to April 10, 2012, for treatment of breathing difficulties and chest pain. (R. at 486-90, 499-504, 569-72.) She was consistently alert, oriented and in no acute distress. (R. at 488, 501, 571.) In November and December 2011, Hilliard had normal respiratory rhythm and effort, but with some prolonged expiratory wheeze. (R. at 488, 500-01.) Cardiac examinations were normal, she had no peripheral edema, a normal gait and intact cranial nerves. (R. at 488, 501.) On November 14, 2011, Dr. Odum determined that she was experiencing likely atypical chest pain, and he diagnosed epicondylitis and prescribed doxycycline and prednisone. (R. at 501-02.) On

-11-

December 19, 2011, a chest x-ray was negative for acute disease, and Dr. Odum diagnosed asthma and numbness. (R. at 488-90.) He prescribed gabapentin, prednisone, Ultracet for bilateral leg pain, and he gave Hilliard Spiriva samples. (R. at 488-89.) By April 10, 2012, Hilliard denied wheezing and chest pain, but reported some sneezing and congestion with minimal cough. (R. at 569.) Pulmonary and cardiac examinations were normal, she had no peripheral edema, a normal gait and intact cranial nerves. (R. at 571.) Dr. Odum diagnosed asthma, continued her on Symbicort, Singulair and Claritin and decreased her Xanax dosage. (R. at 571-72.)

Hilliard saw Dr. John Berry, M.D., at Wellmont CVA Heart Institute on November 23, 2011, for chest pain. (R. at 299-303, 491-94 .) It was noted that she had negative cardiac enzymes and a normal ECG during a recent emergency department visit. (R. at 299, 491.) She reported feeling tired with some dyspnea, beyond her usual COPD, which she felt was well-controlled. (R. at 299, 491.) Hilliard reported a dull feeling from the sternum to the shoulder blade. (R. at 299, 491.) She denied gasping and/or choking at night. (R. at 301, 493.) Pulmonary and cardiac examinations were normal, and no musculoskeletal deformities were noted. (R. at 301, 493.) Hilliard was fully oriented with an appropriate mood. (R. at 301, 493.) She reported taking Xanax three times daily, and Dr. Berry noted that she seemed a "bit sedated." (R. at 299, 491.) Dr. Berry diagnosed precordial chest pain[7] and shortness of breath. (R. at 301, 493.) He noted a component of back pain with the chest pain, and he reported that chest wall tenderness suggested a

_____

[7] Precordial chest pain refers to pain in the area over the heart and lower part of the thorax. *See* Dorland's at 1348.

-12-

musculoskeletal possibility. (R. at 301, 493.) A cardiac CT angiography with assessment of left ventricle function revealed normal left and right ventricular systolic function, a calcium score of 35.4,[8] mild calcific stenosis of the ostal left anterior descending artery, normal thoracic aorta and central pulmonary arteries and mild pulmonary emphysema. (R. at 309-11, 495, 497-98.)

On February 22, 2012, Dr. Lisa McKinney, D.O., a pulmonologist at Blue Ridge Medical Specialists, wrote a letter to Dr. Odum, stating that she was treating Hilliard for complaints of increased shortness of breath, intermittent wheezing, a nonproductive cough, waking up smothering at times and insomnia. (R. at 560-61.) Dr. McKinney noted that pulmonary function testing from April 2009 showed a mild obstructive pattern with small airway disease that did not show significant reversibility with bronchodilator therapy. (R. at 560.) She further noted that Hilliard wore two liters of oxygen at night. (R. at 560.) Physical examination showed 97 percent oxygen saturation on room air, no paradoxical breathing pattern was noted, there was no stridor, and she had bilateral equal expansion with no crepitus over the chest or neck and no use of accessory muscles. (R. at 561.) Hilliard's lungs had no dullness to percussion, no wheezes, rales or rhonchi. (R. at 561.) Cardiovascular examination was normal, the abdomen was soft, and lower extremities had no clubbing, cyanosis or edema. (R. at 561.) Dr. McKinney diagnosed asthma with a mild obstructive defect, she continued Hilliard on inhaler therapy, and she gave her samples of Symbicort. (R. at 561.) She advised of a need to schedule Hilliard for pulmonary function testing to compare to the 2009

---

[8] The report indicates that this score placed Hilliard in the 98th percentile, meaning that only two percent of patients of Hilliard's age and gender had a worse score. (R. at 309.)

testing.  (R. at 561.)  On February 28, 2012, Hilliard underwent plethysmography testing, which showed moderate airway obstruction with reversibility and improvement of small airways disease with no restrictive defect or decrease in diffusion capacity.  (R. at 557-59.)  Hilliard returned to Dr. McKinney on March 29, 2012, reporting very impressive shortness of breath when showering and with exertion.  (R. at 557.)  Physical examination remained unchanged, and Dr. McKinney diagnosed asthma and COPD.  (R. at 557.)  She continued Hilliard on Symbicort, Spiriva, albuterol and oxygen, and she recommended a six-minute walk test.  (R. at 557.)  Dr. McKinney also advised her to start walking and exercising to lose weight.  (R. at 557.)

On May 15, 2012, Dr. Michael Hartman, M.D., a state agency physician, completed a physical residual functional capacity assessment of Hilliard in connection with her initial disability review.  (R. at 79-81.)  Dr. Hartman opined that Hilliard could perform light work with occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling and no climbing of ladders, ropes or scaffolds.  (R. at 79-80.)  He further opined that she must avoid concentrated exposure to extreme temperatures, wetness, humidity and hazards, such as machinery and heights, and she must avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation.  (R. at 80-81.)

On May 16, 2012, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), in connection with Hilliard's initial disability review.  (R. at 78.)  Jennings found that Hilliard was mildly restricted in her activities of daily living, experienced mild difficulties in

-14-

maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 78.) She concluded that Hilliard did not have a severe mental impairment. (R. at 78.)

Hilliard began seeing Dr. Dave Arnold, M.D., at Healing Hands Health Center, on September 26, 2012, as her new primary care physician. (R. at 599-600.) She saw him on eight occasions from September 26, 2012, to January 31, 2013. (R. at 596-600, 639-42.) Over this time, she complained of sinus congestion, shortness of breath, wheezing, right lateral hip pain, mild right groin pain, chronic depression, anxiety, mind racing, difficulty falling asleep, foot pain and neuropathy, a growth on the top of her left foot and numbness. (R. at 596-600, 639, 642.) On September 26, 2012, it was noted that Hilliard had experienced no heart racing after undergoing three arrhythmia ablations in 2007. (R. at 600.) She reported abuse as a child, losing a nephew to a car accident five years previously, her mother's death in 2012 and losing her home nursing job. (R. at 600.) She had normal lung and cardiovascular examinations. (R. at 600.) Dr. Arnold diagnosed asthma and COPD, with asthma being the primary problem, as well as depression. (R. at 599-600.) Dr. Arnold increased her Symbicort dosage, prescribed Nasacort and Clarinex and continued her on Effexor. (R. at 599.) When Hilliard returned to Dr. Arnold on October 3, 2012, he informed her that testing confirmed a diabetes diagnoses. (R. at 599, 605-07.) She reported that she was less short of breath since beginning an increased Symbicort dosage, but she had more difficulty falling asleep and increased mind racing. (R. at 599.) Dr. Arnold increased Hilliard's dosage of Neurontin and prescribed metformin. (R. at 599.) On October 10, 2012,

-15-

Hilliard returned to Dr. Arnold, reporting much less shortness of breath and wheezing with the increased Symbicort dosage and improved nasal congestion with Nasacort and Clarinex. (R. at 598.) She also reported being slightly less depressed since starting an increased dosage of Effexor and improved pain in the feet with increased Neurontin. (R. at 598.) She reported a lot of pain at times in her right lateral hip and over the right groin with a locking feeling in her hip at times. (R. at 598.) Her diagnoses were diabetes, asthma and allergic rhinitis, peripheral neuropathy and right hip pain. (R. at 598.) Dr. Arnold ordered hip x-rays, which showed no acute osseous, articular or soft tissue abnormality. (R. at 598, 604.)

Hilliard saw Dr. Arnold on November 6, 2012, reporting improved neuropathy, but still pretty bad at times. (R. at 597.) She reported feeling a lot less depressed since restarting Effexor approximately three months previously, but her anxiety had improved only slightly. (R. at 597.) Hilliard continued to report quite a bit of lateral and anterior right hip pain. (R. at 597.) Dr. Arnold diagnosed peripheral neuropathy, diabetes, depression and anxiety, and he prescribed Cymbalta in place of Effexor. (R. at 597.) He continued her on Neurontin and metformin. (R. at 597.) However, when Hilliard returned to Dr. Arnold on December 11, 2012, she noted no improvement in her emotional state or in her leg pain with the Cymbalta. (R. at 595.) She described her pain as "bearable," but still fairly bothersome. (R. at 595.) Hilliard also had a growth on the top of her left foot, which was uncomfortable inside her shoe. (R. at 595.) Dr. Arnold diagnosed subcutaneous fibroma on the left foot, peripheral neuropathy and diabetes, and her dosage of Neurontin was increased. (R. at 596.) By January 11, 2013, Hilliard

-16-

reported that she was not sleeping well due to racing thoughts and anxiety. (R. at 642.) She noted that her neuropathy pain had improved somewhat on a higher dose of Neurontin, but remained "pretty bad." (R. at 642.) Hilliard's blood sugar levels were much better, but she reported frequent numbness of the hands, especially at night in bed. (R. at 642.) She was diagnosed with carpal tunnel syndrome several years previously, but did not have any wrist splints. (R. at 642.) Phalen's testing[9] caused tingling in her second and third fingers on the right hand. (R. at 642.) Dr. Arnold removed the skin lesion from her left foot, and he diagnosed diabetes, painful peripheral neuropathy, depression, anxiety and bilateral carpal tunnel syndrome. (R. at 642.) He initiated a plan to get her back on Cymbalta, and he advised her to buy a splint for one wrist to gauge whether it helped. (R. at 642.) By January 31, 2013, she reported improved pain in the left foot and much less depression and anxiety symptoms with Prozac, but noted increased neuropathy pain due to cold weather. (R. at 639.) Her A1C levels were down. (R. at 639.) Dr. Arnold diagnosed painful peripheral neuropathy, depression, anxiety and diabetes, and he continued her on Neurontin, Xanax and diabetes medication, and he replaced Effexor with Cymbalta. (R. at 639.)

On February 19, 2013, Sandra Francis, Psy.D., a state agency psychologist, completed a PRTF of Hilliard in connection with the reconsideration of her disability claim, finding that she was mildly restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated

---

[9] Phalen's test is utilized to check for the presence of carpal tunnel syndrome. *See* www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (last visited Sept. 27, 2016).

-17-

episodes of decompensation of extended duration. (R. at 90-91.) Francis opined that Hilliard would have some difficulty in social settings and with concentration. (R. at 91.) She also completed a mental residual functional capacity assessment of Hilliard, finding that she was moderately limited in her ability to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (R. at 94-96.)

Also on February 19, 2013, Dr. Catherine Howard, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding that Hilliard could perform light work with occasional climbing of ramps and stairs, balancing, stooping, kneeling and crouching and no climbing of ladders, ropes or scaffolds and crawling. (R. at 92-94.) She opined that Hilliard should avoid concentrated exposure to extreme temperatures, fumes, odors, dusts, gases and poor ventilation, as well as hazards, such as machinery and heights. (R. at 93-94.)

Hilliard continued seeing Dr. Arnold from March 11 through October 29, 2013, with complaints of upper and lower back pain, leg pain, shortness of breath, depression and anxiety, chest pain, neuropathy of the feet and fingers, poor balance and grip, right lateral thigh pain, bilateral groin pain, cough, wheezing and

-18-

decreased memory. (R. at 630-38, 721.) On March 11, 2013, lung and cardiovascular examinations were normal, oxygen saturation level was 96 percent, and Hilliard's breathing did not become labored when walking the hall. (R. at 638.) She reported no noticeable improvement of neuropathic pain with Cymbalta. (R. at 638.) Hilliard reported that counseling had helped her mental health symptoms in the past. (R. at 638.) On April 5, 2013, a CT scan of the chest was negative for pulmonary embolism. (R. at 637.) Hilliard had tenderness over the lower ribs, bilaterally, and over the left upper back. (R. at 637.) By April 18, 2013, Hilliard reported that Skelaxin helped her pain quite a bit, and by April 25, 2013, she reported very little shortness of breath, but that the numbness in her feet had gotten much worse over the previous six months, and she reported numbness in her fingers. (R. at 636-37.) She further reported worsened balance and poor grip, but stable and fairly well-controlled leg pain with Cymbalta and Neurontin. (R. at 636.) She again reported that Skelaxin helped. (R. at 636.) Physical examination on that date was mostly normal, except for decreased sensation to light touch in the fingertips, toes and ankles. (R. at 636.)

On May 22, 2013, Dr. Arnold noted the possibility that Hilliard's neuropathy might be, at least partly, due to her long-term usage of proton pump inhibitors. (R. at 636.) On July 29, 2013, Hilliard reported that the neuropathic pain had begun to extend into her thighs. (R. at 634.) Her lungs were clear, and deep pedal pulses in the extremities were normal. (R. at 634.) Dr. Arnold discontinued Neurontin and prescribed Lyrica. (R. at 634.) On September 26, 2013, Hilliard reported severe low back pain, radiating into the right lateral thigh and into the groin, bilaterally. (R. at 632.) She had moderate lower lumbar

-19-

tenderness with positive straight leg raise testing bilaterally. (R. at 632.) Dr. Arnold prescribed Celebrex and Lortab. (R. at 632.) However, by October 2, 2013, Hilliard reported improved back pain until straining it coughing the previous day. (R. at 631.) On physical examination, her lungs were clear, she had moderate lumbar tenderness and positive straight leg raise testing bilaterally, and cardiovascular examination was normal. (R. at 631.) On October 16, 2013, Hilliard described her back as somewhat better, but still fairly severe at times, with spells of severe pain in the right lateral thigh. (R. at 630.) She continued to report significant shortness of breath at times. (R. at 630.) By October 29, 2013, Hilliard's back pain was much better, and the neuropathic pain in her feet and legs had somewhat improved with Lyrica. (R. at 721.) She reported decreased memory over the previous six or seven months and worsened depression over the previous few months, despite taking Cymbalta. (R. at 721.) Hilliard also reported that her nerves had been bothering her a lot lately, despite taking Xanax, and she stated that she had noticed no improvement in her anxiety with Lyrica. (R. at 721.) Over this time period, Dr. Arnold diagnosed Hilliard with bronchitis, depression, anxiety, chest pain and dyspnea due to diffuse muscle strain from coughing, peripheral neuropathy, asthma, low back pain with probable right-sided lumbosacral radiculopathy, COPD exacerbation, diabetes, fatigue and poor memory. (R. at 630-32, 634-38, 721.)

A sleep study, performed on November 4, 2013, at Bristol Regional indicated mild obstructive sleep apnea. (R. at 711-13, 727.) A full-night sleep study was performed on December 6, 2013, and showed no evidence of sleep-related breathing disorder, but significant snoring and occasional sinus pauses. (R.

at 697-701, 710, 725-26.)

Dr. Edwin Cruz, M.D., a medical expert, completed responses to a Medical Interrogatory Physical Impairment(s) -- Adults form on November 22, 2013, at the direction of the ALJ. (R. at 687-89.) Dr. Cruz opined that Hilliard's impairments did not equal any impairment in the medical listings. (R. at 688.) He also completed a physical assessment of Hilliard, finding that she could continuously lift and carry items weighing up to 50 pounds and frequently lift and carry items weighing up to 100 pounds, she could sit/stand/walk for a total of eight hours in an eight-hour workday, that she could sit for up to four hours without interruption and that she could stand and walk for up to two hours without interruption. (R. at 690-95.) He opined that Hilliard frequently could use both hands for overhead reaching and pushing/pulling and that she continuously could use both hands for reaching in all other directions, handling, fingering and feeling. (R. at 692.) He found that she could continuously use both feet for the operation of foot controls. (R. at 692.) Dr. Cruz opined that Hilliard could occasionally climb ladders and scaffolds and continuously climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 693.) He found that she could continuously work around unprotected heights, moving mechanical parts and vibrations and could operate a motor vehicle continuously. (R. at 694.) However, Dr. Cruz opined that Hilliard could never work around humidity and wetness, dust, odors, fumes and pulmonary irritants or extreme cold, occasionally work around extreme heat and frequently work around loud noise. (R. at 694.) Dr. Cruz opined that Hilliard could perform activities of daily living. (R. at 695.) He indicated that these limitations were first present on November 7, 2011. (R. at 695.)

-21-

Dr. Cruz also wrote a letter to the ALJ, stating that he had reviewed Hilliard's medical records, but noted no evidence of any progressive deterioration in her expiratory flow rates. (R. at 685-86.) He opined that her neuropathy was mild with no evidence of deterioration in neurologic function. (R. at 686.) Dr. Cruz opined that Hilliard's impairments did not meet or equal the criteria for any medical listing. (R. at 686.) He further opined that she should avoid noxious gases, fumes, cold air, tobacco and tobacco fumes, which may trigger, precipitate or aggravate her wheezing. (R. at 686.) He concluded that Hilliard should be able to perform repetitive tasks and duties requiring mild to moderate workloads and exertion. (R. at 686.)

Hilliard continued to see Dr. Arnold between November 27, 2013, and February 25, 2014. (R. at 717-20.) Over this time, she continued to complain of poor memory, pain in her right hip/groin, severe low back pain radiating into the legs, numbness in the feet, legs and fingertips and difficulty balancing. (R. at 717-20.) On November 27, 2013, Dr. Arnold increased Hilliard's Prozac and Lyrica dosages and prescribed Invokana for diabetes. (R. at 720.) On December 23, 2013, Hilliard reported that her pain was only slightly better, she felt more tired and had increased depression, which she attributed to the approaching holidays and her mother's and nephew's deaths several years previously. (R. at 719.) FABERE testing[10] provoked right-sided groin pain, and she had moderate tenderness over the lower lumber muscles and spine. (R. at 719.) Dr. Arnold

---

[10] FABERE is an acronym for flexion, abduction, external rotation and extension of the hip. The FABERE test is used to identify hip arthritis or sacroiliac dysfunction. *See* www.medical-dictionary.thefreedictionary.com/FABER+test (last visited Sept. 27, 2016).

ordered hip x-rays and adjusted her Lyrica and Prozac dosages. (R. at 719.) X-rays of the hips, taken on January 16, 2014, were unremarkable. (R. at 724.)

On February 3, 2014, Hilliard reported continued severe low back pain and pain in the right groin with some tenderness and severe neuropathic pain in both legs. (R. at 718.) She appeared somewhat uncomfortable and exhibited moderate lower lumbar tenderness. (R. at 718.) Tenderness over the right groin was worsened with hip flexion. (R. at 718.) Dr. Arnold prescribed Norco. (R. at 718.) A February 17, 2014, MRI of the lumbar spine indicated degenerative disc disease at the L5-S1 level with disc dehydration and a small midline disc protrusion, but no disc extrusion. (R. at 62-63, 722.) On February 25, 2014, Hilliard continued to report severe lower back pain, severe pain in the thighs, especially laterally, and into the groin region, bilaterally, from neuropathy. (R. at 717.) Dr. Arnold noted that, as Hilliard's feet had gotten more numb, the pain in her feet had lessened, but she was having more difficulty with balance and had fallen several times. (R. at 717.) Over this time period, Dr. Arnold diagnosed Hilliard with depression, anxiety, sleep apnea, peripheral neuropathy, diabetes, lower back pain with possible lumbar radiculopathy and lower extremity pain and obesity. (R. at 717-20.) In addition to her other medications, he prescribed amitriptyline. (R. at 717.)

A March 28, 2014, MRI of Hilliard's brain revealed no indication of acute intracranial process or abnormal intracranial enhancement. (R. at 60.)

On April 2, 2014, Dr. Arnold completed a mental assessment of Hilliard,

placing her then-current Global Assessment of Functioning, ("GAF"),[11] score at 61 to 70.[12] (R. at 64-68.) He noted moderate improvement in Hilliard's depression and anxiety on Cymbalta, Prozac, trazodone and Xanax, but continued emotional lability at times, and she remained uneasy in public places. (R. at 64.) He noted that counseling made Hilliard feel worse because of recalling memories of sexual abuse as a child. (R. at 64.) Hilliard scored 28/30 on the Mini Mental State Examination, ("MMSE"), losing a point for recalling only two of three words after two minutes and losing another point on counting backwards. (R. at 64.) Dr. Arnold noted that Hilliard had not had recurrent severe panic attacks on an average of at least once a week since taking Xanax. (R. at 65.)

Dr. Arnold opined that Hilliard had an unlimited or very good ability to maintain regular attendance and be punctual within customary, usually strict, tolerances; to maintain socially appropriate behavior; and to adhere to basic standards of neatness and cleanliness. (R. at 66-67.) He opined she had a limited, but satisfactory, ability to ask simple questions or request assistance; to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; to respond appropriately to changes in a routine work setting; to be aware of normal hazards and take appropriate precautions; to set realistic goals or make plans independently of others; to interact appropriately with the general

---

[11] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[12] A GAF score of 61 to 70 indicates "[s]ome mild symptoms … OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well. …" DSM-IV at 32.

public; to travel in unfamiliar places and to use public transportation. (R. at 66-67.) Dr. Arnold opined that Hilliard had a seriously limited, but not precluded, ability to sustain an ordinary routine without special supervision; to make simple work-related decisions; to perform at a consistent pace without an unreasonable number and length of rest periods; and to deal with normal work stress. (R. at 66.) He opined that she was unable to meet competitive standards in the areas of remembering work-like procedures; understanding, remembering and carrying out very short and simple instructions; maintaining attention for two-hour segments; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms; accepting instructions and responding appropriately to criticism from supervisors; understanding, remembering and carrying out detailed instructions; and dealing with stress of semi-skilled and skilled work. (R. at 66-67.) He opined that Hilliard would miss about three workdays monthly, that she was not a malingerer and that her impairments were reasonably consistent with the symptoms and functional limitations he described in the assessment. (R. at 68.)

Dr. Arnold also completed a physical assessment of Hilliard on April 2, 2014. (R. at 69-73.) Dr. Arnold stated that Hilliard's neuropathic leg pain, most severe in her feet, was constant and worsened by cold weather and prolonged standing and that her chronic severe low back pain was worsened by cold weather and carrying groceries. (R. at 69.) He noted that Lyrica only slightly improved her pain, amitriptyline caused severe confusion, and Cymbalta helped her depression, but not her pain. (R. at 69.) Dr. Arnold again noted that Hilliard was not a

-25-

malingerer. (R. at 70.) He deemed her impairments reasonably consistent with the symptoms and functional limitations described in his assessment. (R. at 70.)

Dr. Arnold opined that Hilliard would frequently[13] experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks. (R. at 70.) He estimated that Hilliard could walk two city blocks without rest or severe pain, that she could both sit and stand for up to 20 minutes without interruption, that she could sit and stand/walk for a total of about four hours in an eight-hour workday and that she needed to walk around approximately every 30 minutes for four minutes. (R. at 70-71.) He opined that she needed to shift positions at will from sitting, standing or walking and that she would sometimes need to take five- to 10-minute unscheduled breaks every one to two hours during an eight-hour workday. (R. at 71.) He further opined that Hilliard would need to use a cane or other assistive device with occasional standing/walking when her balance was poor. (R. at 71.) Dr. Arnold opined that Hilliard could occasionally lift and carry items weighing less than 10 pounds, rarely lift and carry items weighing 10 pounds and never lift and carry items weighing 20 pounds. (R. at 71.) He found that she could frequently look down, turn her head right or left and look up, occasionally hold her head in a static position, twist and climb stairs and never stoop (bend), crouch/squat and climb ladders. (R. at 72.) Dr. Arnold opined that Hilliard had significant limitations with reaching, handling and fingering. (R. at 72.) He opined that Hilliard would be absent from work more than four days monthly. (R. at 72.)

---

[13] "Frequently" was defined on this assessment as meaning 34 to 66 percent of an eight-hour workday. (R. at 70.)

-26-

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

-27-

Hilliard argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 12-14.) Hilliard further argues that the ALJ erred by failing to properly identify other work existing in significant numbers in the national economy that she could perform. (Plaintiff's Brief at 14-16.) Lastly, Hilliard argues that the opinion evidence from Dr. Arnold submitted to the Appeals Council warrants further review. (Plaintiff's Brief at 16-21.)

The ALJ found that Hilliard had the residual functional capacity to perform simple, routine, repetitive light work that did not require more than occasional climbing of ramps and stairs, bending, stooping, kneeling, crouching and crawling, that required no climbing of ladders, scaffolds or ropes, that did not require concentrated exposure to temperature extremes, that required no more than occasional exposure to dust, chemicals and fumes and that required no public interactions and no more than occasional interaction with co-workers and supervisors. (R. at 24.) The ALJ stated that she gave significant weight to the opinion of Dr. Cruz. (R. at 23.) However, Hilliard argues that the ALJ failed to address the inconsistencies between her decision and Dr. Cruz's assignment of limitations, which would impact her ability to perform the jobs identified in the decision or any other work activity. (Plaintiff's Brief at 12.) She specifically argues that the ALJ failed to address any sitting or standing/walking limitations or any restrictions on the use of her hands, and the only environmental limitations imposed by the ALJ were the need to avoid concentrated exposure to extreme temperatures and have no more than occasional exposure to dust, chemicals and fumes, while Dr. Cruz opined that Hilliard could stand and/or walk for only two

-28-

hours at a time, sit for only four hours at a time, perform only frequent overhead reaching, as well as pushing/pulling with the hands and should never be exposed to humidity, wetness, dust, odors, fumes and pulmonary irritants and extreme cold. (Plaintiff's Brief at 12-13.)  Hilliard argues that the ALJ failed to properly analyze Dr. Cruz's opinion and sufficiently explain the weight she gave thereto. (Plaintiff's Brief at 14.)   For the following reasons, I am not persuaded by Hilliard's argument.

It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.  *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if she sufficiently explains her rationale and if the record supports her findings.  Furthermore, an ALJ is not bound to adopt a medical opinion in its entirety, even when she gives it significant weight.  *See* 20 C.F.R. § 404.1527(d) (2015) (the issue of residual functional capacity is reserved solely to the Commissioner); *see also Mays v. Barnhart*, 2003 WL 22430186, at *4 (3d Cir. 2003); *Titterington v. Barnhart*, 2006 WL 584277, at *4 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining a [residual functional capacity]").  Therefore, the relevant question is whether the ALJ's residual functional capacity assessment is based upon all the relevant evidence, including medical records, medical source

-29-

opinions and the claimant's subjective allegations and description of her own limitations. *See* 20 C.F.R. § 404.1546(c) (2015). I find that the ALJ did just that in this case.

As the Commissioner stated in her brief, the ALJ considered the entire record, which included largely normal pulmonary and cardiac examinations, normal gait and intact cranial nerves at several examinations, various diagnostic studies showing no significant abnormalities, some improvement of neuropathy symptoms with medication, an ability to perform several activities of daily living, Dr. Cruz's opinion that Hilliard could perform a reduced range of medium work and the opinions of state agency physicians Drs. Hartman and Howard that she could perform a range of light work. With regard to the ALJ's mental residual functional capacity finding, she considered that Hilliard took anti-depressant and anti-anxiety medications, which helped to control her symptoms, that she required no hospitalizations nor sought outpatient mental health treatment during the relevant period, the lack of evidence of serious cognitive deficits, panic attacks or significant signs of depression or anxiety during her clinical visits and her ability to perform several activities of daily living. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Also, contrary to Hilliard's argument, the ALJ did incorporate Dr. Cruz's sitting and standing/walking limitations, as Dr. Cruz found that she could sit, stand and walk for eight hours in an eight-hour workday. Additionally, as the Commissioner notes in her brief, at least two of the jobs identified by the

-30-

vocational expert do not require more than frequent reaching and do not require exposure to dust, odors, fumes and pulmonary irritants and, therefore, are consistent with Dr. Cruz's limitations. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, ("DOT"), checker I (clerical), occupational code 222.687-010 (4th ed. Rev. 1991); 1 DOT, office helper (clerical), occupational code 239.567-010.

For all of these reasons, I find that the ALJ's residual functional capacity determination is supported by substantial evidence.

Next, I find that substantial evidence also supports the ALJ's finding that Hilliard could perform work existing in significant numbers in the national economy. Hilliard argues that the ALJ erred by finding that she could only occasionally bend, but did not present this limitation to the vocational expert. (Plaintiff's Brief at 14.) Nonetheless, the ALJ relied on the jobs identified by the vocational expert. Therefore, argues Hilliard, the ALJ's decision is not supported by substantial evidence, as she failed to meet her burden, at the fifth step of the sequential evaluation process, of showing that other work exists that she could perform. Based on the vocational expert's testimony, the ALJ found that Hilliard retained the ability to perform the jobs of an inventory clerk, a food prep worker and an office helper. As the Commissioner argues in her brief, the ALJ's failure to specify a limitation to occasional "bending" constitutes harmless error because such a limitation does not significantly erode the occupational base for light work. Most light jobs require only occasional bending. *See* S.S.R. 83-14, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). Additionally, stooping, kneeling, crouching and crawling are progressively more strenuous forms

of bending parts of the body. *See* S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992). If a person can stoop occasionally, the sedentary and light occupational base is virtually intact. *See* S.S.R. 85-15. Here, the ALJ's hypothetical to the vocational expert included occasional stooping, kneeling, crouching and no crawling; thus, any error in failing to include "bending" was harmless error not warranting remand. *See Harrington v. Astrue*, 2008 WL 819035, at * 4 (M.D. N.C. Mar. 21, 2008) (finding no distinction between bending and stooping); *see also Chester v. Callahan*, 193 F.3d 10, 13 n.1 (1st Cir. 1999) (finding that the ability to stoop includes the ability to bend). Finally, according to the DOT, the jobs of inventory clerk and food prep worker do not involve stooping, kneeling, crouching or crawling. *See* 1 DOT, checker I (clerical), occupational code 222.687-010; 1 DOT, deli cutter-slicer (retail trade), occupational code 316.684-014  According to the DOT, the job of office helper involves occasional stooping, but does not involve kneeling, crouching or crawling. *See* 1 DOT, office helper (clerical), occupational code 239.567-010. Even allowing for a minor erosion of the occupational base, as few as 110 jobs within the region may constitute a significant number. *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979).  Here, the vocational expert identified more than 1.3 million jobs in the national economy and 19,000 jobs in the regional economy that Hilliard could perform.  Because occasional bending does not significantly erode the occupational base for light work, I find that the ALJ's omission was harmless error not warranting remand. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (holding that plaintiff carries the burden of showing how the alleged error would have made a difference in the outcome of his disability claim).

-32-

For all of the above-stated reasons, I find that substantial evidence supports the ALJ's finding that a significant number of jobs Hilliard could perform existed in the national and regional economies.

Lastly, I am not persuaded that the evidence submitted for the first time to the Appeals Council warrants remand. It is well-settled that a disability benefits claimant may submit new and material evidence to the Appeals Council. *See Wilklins*, 953 F.2d at 95-96. "New evidence" is not duplicative or cumulative, and "material evidence" has a reasonable possibility that it would have changed the outcome of the Commissioner's decision. *See Wilkins*, 953 F.2d at 95-96. Remand is not warranted in a disability benefits case simply because new evidence submitted to the Appeals Council might change particular elements of the ALJ's decision. The critical inquiry is whether the conclusion itself could be changed. *See Brown v. Comm'r of Soc. Sec.*, 969 F. Supp. 2d 433, 441 (W.D. Va. 2013). Here, Hilliard seeks a remand based upon the opinion evidence from his treating physician, Dr. Arnold, dated April 2, 2014. The Appeals Council concluded that this evidence was about a later time, as the ALJ decided Hilliard's case through January 29, 2014. (R. at 2.)

With regard to her mental residual functional capacity, Hilliard specifically argues that Dr. Arnold's findings that she was "unable to meet competitive standards" in seven areas of abilities and aptitudes, that she was "seriously limited, but not precluded" in four such areas and that she would be absent from work about three days monthly precluded the performance of any work. (Plaintiff's Brief at 17-18.) With regard to her physical residual functional capacity, Hilliard

-33-

argues that Dr. Arnold's findings that she would have frequent interferences with attention and concentration; could stand for 20 minutes without interruption; could sit for four hours in an eight-hour workday; could stand/walk for four hours in an eight-hour workday; should be allowed to walk around every 30 minutes; would need five- to 10-minute unscheduled breaks every one to two hours; could occasionally lift less than 10 pounds and rarely lift 10 pounds; could never stoop, crouch or climb ladders; was significantly limited in reaching, handling and fingering; and would miss more than four workdays monthly precluded the performance of any work. (Plaintiff's Brief at 18-19.) Even assuming that this evidence is "new," I find that it is not "material," as there is no reasonable possibility that it would have changed the outcome of the ALJ's decision had she had it before her. Importantly, Dr. Arnold's opinions are inconsistent with his own clinical findings. In particular, despite the rather debilitating functional limitations assessed by Dr. Arnold in the April 2014 "check-box" questionnaires, no such limitations are mentioned in his contemporaneous treatment notes. For instance, Dr. Arnold's treatment notes show that Hilliard showed some improvement of neuropathy with medications; her diabetes was controlled with medication and diet; she had largely normal pulmonary and cardiac examinations; she had a normal gait with intact cranial nerves; and diagnostic studies showed no significant abnormality. Dr. Arnold stated in his narrative report that Hilliard scored a 28/30 on a MMSE and had moderate improvement of depression and anxiety on medications. These findings are consistent with his treatment notes. I further find that Dr. Arnold's opinions regarding Hilliard's physical limitations were inconsistent with the opinions of the state agency physicians, Drs. Hartman and Howard, as well as Dr. Cruz, who all opined that she could perform a range of at

-34-

least light work.

Based on the above reasoning, I find that substantial evidence exists in the record to support the ALJ's finding that Hilliard was not disabled and not entitled to benefits. An appropriate Order and Judgment will be entered.

ENTERED: September 28, 2016.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE